# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-80218-CR-MARRA/MATTHEWMAN(s)(s)

**UNITED STATES OF AMERICA**

**vs.**

**JOHN SHEALEY,**

       **Defendant.**

_____/

### PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and John Shealey (hereinafter referred to as the "defendant") enter into the following agreement:

1. The defendant agrees to plead guilty to the Second Superseding Information, which charges the defendant with conspiracy to:  a) manufacture and distribute a controlled substance analogue, in violation of Title 21, United States Code, Sections 813 and 841(a)(1); b) knowingly conduct and attempt to conduct financial transactions which involved the proceeds of specified unlawful activity, with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and,  c) introduce and cause the introduction into interstate commerce of misbranded drugs, with the intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331(a), 352(a) and 333(a)(2); all in violation of Title 18, United States Code, Section 371.

2. The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing

Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3. The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to 5 years, followed by a term of supervised release of up to 3 years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.

4. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If a defendant is financially unable to pay the special assessment, the

2

defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

5. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

6. The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The United States, however, will not be required to make this motion and this recommendation- or any other recommendation set forth in this plea agreement-  if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct

3

after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7.     The United States and the defendant agree to jointly make the following recommendations under the Sentencing Guidelines to the Court:

(a)     That, pursuant to Section 2D1.1(c)(11), the equivalent quantity of controlled substance analogue exceeded 20 kilograms, for a base offense guideline level of 18;

(b)     That, pursuant to Section 2D1.1(b)(7), the defendants distributed a controlled substance analogue through mass marketing, by means of interactive computer (2 level increase);

(c)     That, pursuant to Section 2D1.1(b)(12), the defendant maintained a premise for the manufacture of a controlled substance analogue (2 level increase);

(d)     That pursuant to Section 3B1.1, the defendant was an organizer or leader of criminal activity involving less than five (culpable) persons (2 level increase);

(e)     That, with a three level decrease for acceptance of responsibility, the total offense level is 21.

8.     The defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title and interest to any and all assets and their substitutes which are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 which are in the possession and control of the defendant or nominees, including, but not limited to, the following:

a.     A money judgment in the amount of Two Million Two Hundred Thousand dollars ($2,200,000.00).

4

b. The contents of Bank of America account number 0055-0930-9809 in the name of John Shealey (approximately $33,603.00).

c. The contents of Bank of America account number 0055-6437-1522 in the name of John Shealey (approximately $26,269.28).

d. The contents of Regions Bank account number 0177-717813 in the name of JPS Holdings Irrevocable Trust. (approximately $5,545.74). In the event that the contents of this account were consolidated with the Bank of America accounts listed in items "b" or "c", then the $5,545.74 will not be forfeited.

e. One 2008 Land Rover Range Rover HSA SUV, VIN SALMF15478A275672.

f. One 2004 Chevrolet TrailBlazer EXT SUV, VIN1GNES16S846123554.

g. One 1957 Ford Custom 300, VIN A7GG154580.

h. One 1969 Dodge Coronet Super Bee, VIN WM23M9A284056.

i. Seven (7) watches: one men's Breitling Datora Montbrillant Chronograph, one men's stainless steel Android, one men's Movado, one men's caterpillar Enigma, one men's Jaeger Le Coultre World Timer Limited Series, one men's black Hublot, one men's pink and black Hublot. The government has agreed to release one Lady's Movado.

j. Approximately $23,114.00 in U.S. currency representing various vendor money orders.

k. Approximately $20,458.00 in U.S. currency representing vendor personal checks.

l. $218,762.30 in U.S. currency from Suntrust account number 1000-1417-59976 in the name of Florida Premier Distributors.

m. $54,221.83 in U.S. currency from JP Morgan Chase account number 4727-17136 in the name of Kratom Lab, Inc.

n. $2,000.00 in U.S. currency in lieu of one (1) G AVENGER Seawolf Breitling watch, vendor Cert. # 1224692, Item # VBG06149.

o. One (1) 2012 Seadoo RXP-X 260 Yellow personal watercraft vessel, VIN # YDV22480B212.

p. The contents of PNC account number 12 0817 3589 in the name of B2B Consultants. ($4,444.37).

q. $9,300.00 in U.S. currency from Ameriprise Financial.

r. $186,127.20 in U.S. currency from Ameriprise Financial.

s. $3,865.00 in U.S. currency from Florida Community Bank.

t. $703.04 in U.S. currency from Progressive Insurance Company.

u. $30,000.00 in U.S. currency from Flagler Bank.

v. $4,000.00 in U.S. currency in lieu of one 2009 Kawasaki motorcycle, VIN JKAZX4R119A004811 and $3,000 in U.S currency in lieu of one 2005 Ford truck, VIN 1FTPX12565NB70043.

w. $15,000.00 in U.S. currency in lieu of three (3) cars: one 1972 Duster, one 1971 Cuda, one 1970's Charger.

x. $8,695.00 in U.S. currency in lieu of one trailer purchased from TRT Sales, Inc 4/27/12.

y. 12412 NC #138 Highway, Norwood, North Carolina, in the name of 138 Aquadale Holdings LLC.

z. 12371 NC #138 Highway, Norwood, North Carolina, in the name of Ryan Jones.

aa. $10,000.00 in U.S. currency representing mortgage payment from John Yeend.

bb. $82,000.00 in U.S. currency from Ameriprise.

6

cc. $19,400.00 in United States currency which is being administratively forfeited by the Drug Enforcement Administration.

The defendant agrees to turn over to the United States the items listed above at the time of the plea agreement if they are not in the custody of the United States at the time of the plea. This does not apply to the real estate.

9.     The defendant further agrees to fully cooperate and assist the Government in the forfeiture of the assets listed above, including the surrender of the above listed items, and to take whatever steps are necessary to pass clear title to the United States, including, but not limited to, the surrender of documents of title, execution of any documents necessary to transfer his interest in any of the above property to the United States, including any necessary corporate authorizations, obtaining executed consents to forfeiture from nominees, or other documents as may be needed to fully accomplish the forfeiture and vest title in the United States. Defendant further knowingly and voluntarily waives the following rights as to assets subject to forfeiture: (1) all constitutional, legal and equitable defenses to the forfeiture of the assets in any judicial or administrative proceeding; (2) any judicial or administrative notice of forfeiture and related deadlines; (3) any jeopardy defense or claim of double jeopardy, whether constitutional or statutory; (4) any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of these assets by the United States; and (5) any right to appeal any order of forfeiture entered by the Court pursuant to this plea agreement. Defendant further understands that the forfeiture of these assets shall not be treated as satisfaction or offset against any fine, restitution, cost of imprisonment, or any other penalty this court may impose on the defendant.

10. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

11 . The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b) and Title 28, United States Code, Section 1291. However, if the United States appeals the defendant's sentence pursuant to Sections 3742(b) and 1291, the defendant shall be released from the above waiver of

appellate rights.  By signing this agreement, the defendant acknowledges that the defendant has

discussed the appeal waiver set forth in this agreement with the defendant's attorney.  The defendant

further agrees, together with the United States, to request that the Court enter a specific finding that

the defendant's waiver of the defendant's right to appeal the sentence to be imposed in this case was

knowing and voluntary.

12.  This is the entire agreement and understanding between this Office and the defendant.

There are no other agreements, promises, representations, or understandings.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 3/1/13

By: _____
ROGER H. STEFIN
ASSISTANT UNITED STATES ATTORNEY

Date: 3/1/13

_____
MARK SEITLES, ESQ.
ATTORNEY FOR DEFENDANT

Date: 3/1/13

_____
JOHN SHEALEY
DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>12-80218-CR-MARRA/MATTHEWMAN(s)(s)</u>

UNITED STATES OF AMERICA  )
                          )
v.                        )
                          )
JOHN SHEALEY,             )
                          )
        Defendant.        )
_____)

**FACTUAL PROFFER**

The United States of America and JOHN SHEALEY (hereinafter the "defendant"),
submit this factual proffer in support of the proposed plea agreement in this matter and stipulate
that, if this case were to go to trial, the government would establish a prima facie case of guilt to
the offense contained in the Second Superseding Information, based upon the following
undisputed facts:

1.    The term "controlled substance analogue" means a substance: (1) the chemical
structure of which is substantially similar to the chemical structure of a controlled substance in
schedule I or II; and, (2) which has a stimulant, depressant, or hallucinogenic effect on the
central nervous system that is substantially similar to or greater than the stimulant, depressant, or
hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II;
or (3) with respect to a particular person, which such person represents or intends to have a
stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially
similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central

1

nervous system of a controlled substance in schedule I or II.   Title 21 United States Code 802(32)(A).

2.   Synthetic cannabinoids refers to chemical substances which mimic the physical and psychological effects of marijuana and are intended to be ingested in the human body, mainly through smoking.  Synthetic cannabinoid products are manufactured and packaged in clandestine labs throughout the United States and elsewhere and are frequently sold via the internet and through "legitimate" establishments, such as convenience stores, gas stations, smoke shops, head shops and other retail outlets.  The substances have been packaged and sold under various name brands.  The packaging often refers to the product as "incense" or "potpourri," and bears false labeling, stating that it is "not for human consumption."   In fact, as the manufacturers, distributors and end users of these products are well aware, the product has no purpose other than for human consumption.

3.   On or about March 1, 2011, a synthetic cannabinoid known as JWH-018  was placed on the temporarily banned listed by DEA as a Schedule I controlled substance.  Therefore, any analogues of JWH-018 became illegal as well.

4.   In January 2012, agents from the West Palm Beach Resident Office of the DEA initiated an investigation into the activities of an individual (J.L.) who was believed to be a distributor of synthetic cannabinoids in South Florida.  As a result of the investigation, on March 30, 2012, agents executed a federal search warrant on a business belonging to J.L. and seized thousands of packages of synthetic cannabinoid products, among other things.  A large majority of the synthetic cannabinoid products seized from J.L.'s business was packaged and sold under the brand name "Mr. Nice Guy".

5. J.L identified the defendant as one of the suppliers of the Mr. Nice Guy products. J.L. admitted that he had been purchasing synthetic cannabinoids from the defendant for approximately a year. Under DEA supervision, J.L made a controlled purchase of additional "Mr. Nice Guy" products. The delivery of the products took place in a parking lot in Boca Raton, Florida, and was made by one of the employees of the defendant.. The amount of synthetic cannabinoid product delivered that afternoon was approximately 20 kilograms.

6. Representative samples of the Mr. Nice Guy products seized from J.L.were submitted to a DEA lab for testing and tested positive for several chemical compositions, including 1-(5-Fluoropentyl)-3-(1-naphthoyl)indole, commonly known as AM-2201. According to DEA chemists, AM-2201 has a similar chemical structures to that of JWH-018. Additionally, AM-2201 has the same or similar physiological effect on the human body when ingested as that of JWH-018. Therefore, AM-2201 meets the definition of a controlled substance analogue.

6. The evidence would additionally show that the defendant was involved in manufacturing synthetic cannabinoid products under the "Mr. Nice Guy" brand name subsequent to March 2011, when JWH-018 was listed as a Schedule I controlled substance, and that AM-2201 was one of the chemicals utilized by the defendant. The defendant further operated under a number of company names, including Kratom Lab Inc, AGX Products, LLC, AXG Commercial Lending Group, LLC, and Florida Premier Distributors, LLC, among others, all located in Palm Beach County, Florida. Witnesses would identify the defendant as one of the owners of Kratom Lab and a principal behind the other companies. Employees of the defendant were aware that the product being manufactured was for human consumption, despite the labeling on the packaging which falsely stated otherwise. Employees were also generally aware that the products, when ingested, had the same or similar physiological effect on the human body

3

as other synthetic cannabinoids.  The product was advertised over the internet and sold both locally and to customers throughout the United States.

7.  The evidence would show that chemicals used by Kratom Lab to manufacture the Mr. Nice Guy products were being imported from China.  The evidence would also show that the "Mr. Nice Guy" product consists of marshmallow leaf, acetone, and the chemical analogue. According to witnesses, the marshmallow leaf would be placed into an industrial sized cement mixer, and would then be sprayed with the powder analogue that has been diluted in acetone. Due to the strong odor and toxic fumes from the acetone and the analogue, Kratom Labs' employees would wear protective gear during the mixing process.

8.  The marshmallow leaf or similar plant materials would be purchased from overseas, and paid for by wire transfer from bank accounts established by the defendant and Shealey.  On or about February 2, 2012, the defendant caused a wire transfer in the amount of $100,000 to be made from the bank account of Kratom Lab Inc at PNC Bank to Rosbio Bulgara LTD, at Unicredit Bank, Sofia, Bulgaria.  This was in payment for product used in the manufacturing process.

9.  On July 25, 2012, agents from DEA executed a search warrant at a warehouse located at 2350 N. Military Trail, West Palm Beach, Florida, which had been identified as the most recent location for Kratom Lab.  As a result of the search, agents seized various varieties of Mr. Nice Guy product.

10.  Packaging on the Mr. Nice Guy synthetic cannabinoid products falsely stated that the product was "incense" or "potpourri" and was "not for human consumption," when the defendant knew otherwise.

4

11.  The defendant acknowledges that he was involved in manufacturing more than 20 kilograms of synthetic cannabinoids containing AM-2201.

The foregoing occurred in the Southern District of Florida and elsewhere.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 3/1/13          By: _____
                           ROGER H. STEFIN
                           ASSISTANT UNITED STATES ATTORNEY

Date: 3/1/13          _____
                           MARC SEITLES, ESQ.
                           ATTORNEY FOR DEFENDANT

Date: 3/1/13          _____
                           JOHN SHEALEY
                           DEFENDANT

5