UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.12-80218-CR-MARRA

UNITED STATES OF AMERICA

vs.

JOHN SHEALEY,

         Defendant.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, responds to defendant

John Shealey's Sentencing Memorandum (D.E. 226) and states as follows:

### I.  **The Offense**

The defendant entered a plea of guilty to conspiracy  a) to manufacture and distribute a

controlled substance analogue, in violation of Title 21, United States Code, Sections 813 and

841(a)(1); b) to knowingly conduct and attempt to conduct financial transactions  which involved

the proceeds of specified unlawful activity, that is, violations of Title 21, United States Code, Section

841(a)(1), in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and  c) to introduce

and cause the introduction into interstate commerce of misbranded drugs, with the intent to defraud

and mislead, in violation of Title 21, United States Code, Sections 331(a), 352(a) and 333(a)(2); all

in violation of Title 18, United States Code, Section 371.   The gist of the offense is that, for several

years, the defendant and his partner and co-defendant, Dylan Harrison, engaged in the manufacturing

and distribution of synthetic cannabinoids (designed to imitate the effects of marijuana).  The

product, created from plant material and chemicals imported from abroad, was packaged under the brand name "Mr. Nice Guy," and was labeled as "herbal incense" or "potpouri" and contained the warning that it was "not for human consumption." Of course the defendant well knew that the only purpose of the product was for human consumption, as the effects of the drug can only be felt through ingesting or smoking it. Over the course of a couple of years, the defendant distributed millions of dollars worth of product to retail establishments such as smoke shops, head shops, gas stations, etc. and also sold the product directly to consumers over the internet. It goes without saying that it was a very lucrative business. Further the defendant knew this was a controversial business. Newspaper articles cited the dangers of designer drugs. People were getting arrested, including one of the defendant's wholesalers. One of his warehouses blew up. Yet the defendant allowed the business to continue.

In order to deal with the problem of "designer drugs," the U.S. Congress enacted, in 1986, the Controlled Substance Analogue Enforcement Act (Title 21, United States Code Section 813). This law provides that controlled substance analogues are to be treated as Schedule I controlled substances for the purposes of criminal prosecution. The term "controlled substance analogue" is defined as a substance which: (1) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; (2) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (3) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic

effect on the central nervous system of a controlled substance in schedule I or II (Title 21 United States Code 802(32)(A).

Despite this law, many individuals have attempted to create designer drugs that get around the law- or at least evade law enforcement.   Synthetic cannabinoids grew up as a cottage industry first in Europe and then in the United States, after a research scientist at the Clemson University, John W. Huffman, was able to synthesize chemical substances that mimicked the effects of marijuana.  One of the main chemical combinations, named JWH-018, became the main component in the creation of "designer marijuana."   In March 2011,  DEA placed JWH-018 on a temporary banned list and it was subsequently designated as a Schedule I controlled substance.  Of course the manufacturers of synthetic cannabinoids, including this defendant, immediately turned to other chemical substances which would have the same effect.  One of those substances was a chemical composition called AM-2201.  The defendant utilized this product until it was outlawed in Florida, in March 2012. (AM-2201 was later classified as a Schedule I controlled substance by Congress.) After March 2012, the defendant then turned to a new product, UR-144, which he used until his arrest in late July 2012.   Even before these products were banned federally, however, various states were enacting laws attempting to deal with the scourge of these illicit substances.

Although it may be true, as defendant contends, that he would discard unsold substances once they became listed as banned substances, he nevertheless was acting in ignorance - or disregard - of federal law.  For while the defendant may have thought that he was doing a good thing by throwing product that was banned outright, what he failed to understand was that AM -2201 was  an analogue of JWH-018.  Therefore, his manufacturing and distributing of AM -2201 during the year before it was banned in Florida constituted a violation of Title 21 United States Code, Section 813.

Defendant cites as a mitigating factor the lack of clarity surrounding the legal status of the substance UR-144. The government submits that, had the case gone to trial regarding UR-144, the question of whether UR-144 was an analogue of JWH-018 would have been a question of fact for a jury. However the issue is moot, as the government agreed in its plea agreement to limit defendant's conduct to the distribution of AM-2201. This has resulted in a significant benefit to the defendant under the Sentencing Guidelines, as many hundreds of kilograms of product containing UR-144 was seized during a search warrant executed at the Mr. Nice Guy warehouse.

It appears that a cottage industry of lawyers has sprung up willing to defend manufacturers and distributors of synthetic cannabinoids and other controlled substances. Some lawyers have offered opinions that no violation of law is occurring when a particular product does not contain one of the listed banned substances. In the opinion of the undersigned, any lawyers who are condoning the conduct engaged in by this defendant would be committing malpractice at the very least because they are 1) ignoring the federal analogue statute and 2) ignoring the federal misbranding statute (21 USC 331(a), 352(a) and 333(a)(2). It is quite disingenuous for a lawyer to opine that "because the product is not intended for human consumption" it is not illegal, when the lawyer knows full well that this is the only purpose for the synthetic drug and that the product is clearly being misbranded.

Defendant contends that he hired a lawyer and chemists to determine if his products violated the federal analogue statute and was assured that they did not. Undersigned counsel is not privy to any such communications. Rather, documents seized in search warrants appeared to show that products would be submitted to a lab to determine if they contained banned substances, such as JWH-018 - not analogues of banned substances. These lab reports would then be given to prospective wholesale purchasers to convince them that the products were not illegal. However, the

issue of whether these products contained analogues of controlled substances was skirted altogether. Nevertheless, had the defendant offered a defense based upon advise of counsel, he would have exposed himself to evidence possibly showing that he received contrary advise from lawyers- that is, lawyers telling him that he should get out of the business of manufacturing synthetic cannabinoids. Rather, with the advise of his current good and competent attorneys, he decided to forego any defense based on advice of counsel.

Finally, although the defendant contends that he was attempting to conduct business in a lawful manner, many aspects of the operation of his business was conducted in a manner consistent with an illegal enterprise. In particular the deliberate mislabeling of the drug - a criminal offense in and of itself- was designed to mislead the public - and law enforcement. The bottom line is that the defendant knew that he could get arrested for what he was doing, yet decided that the immense profits justified the risk.

In sum, the defendant made a conscious choice to engage in risky behavior. By pleading guilty he greatly limited his exposure under the sentencing guidelines. This plea bargain came about, in part, because he agreed to a substantial forfeiture of property. The forfeiture should not be the basis for a further downward departure or variance.

Therefore, the United States requests that the defendant be sentenced within the guideline sentencing range calculated by the US Probation office. Although the United States does not necessarily agree with how the probation officer arrived at offense level 21 (37-46 months), this

offense level is consistent with understanding of the parties as set forth in the plea agreement.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:   */s/Roger H. Stefin*
      Roger H Stefin
      Assistant United States Attorney
      Florida Bar No. 0287334
      500 S. Australian Avenue, Suite 700
      West Palm Beach, Florida 33401
      Tel: (561) 209-1055
      Fax: (561) 820-8777
      E-Mail: roger.stefin@usdoj.gov

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed by electronic

filing (ECF) this 10th day of August 2013.

                     */s/ Roger H. Stefin*
                     Roger H. Stefin
                     Assistant United States Attorney